# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

United States of America,

    Plaintiff

v.

Ramon Desage, et. al,

    Defendants

Case No.: 2:13-cr-00039-JAD-VCF

**Order Regarding Tax-loss/Restitution**

Ramon Desage pled guilty to conspiring to defraud the United States.[1] Although he admits in his plea agreement to conspiring to cause fraudulent federal income tax returns to be filed for himself and his entities for the tax years 2006–09,[2] the parties dispute the amount of the tax loss and leave that valuation to the court. For two days of evidentiary hearings,[3] they presented the testimony of competing experts and their reports, and then summarized their respective positions in post-hearing briefs.[4] Having synthesized all this information, I conclude that Desage's loss amount for sentencing and restitution purposes is $28,221,767. I refer this case to the U.S. Probation Office to prepare a Presentencing Investigation Report and reset Desage's sentencing hearing for September 23, 2019, at 2 p.m.

## Background

The parties are intimately familiar with the six-year history of this prosecution, so I don't repeat it here. For purposes of this order, the story begins when Desage pled guilty on August

---

[1] ECF No. 285.

[2] *Id.* at 4.

[3] Transcripts of Evidentiary Hearing ("Tr.") at ECF Nos. 301 (Nov. 16, 2018) and 313 (Dec. 28, 2018).

[4] ECF Nos. 326, 336, 338. After stipulated extensions, briefing was completed on May 31, 2019.

31, 2018, to Count 1 in the Second Superseding Indictment,[5] charging him with conspiracy to defraud the United States in violation of 18 U.S.C. § 371. In his plea agreement,[6] Desage admits that he conspired and agreed with his bookkeeper Gary Parkinson and tax-preparer Peter Akaragian "to cause fraudulent federal income tax returns to be filed" for himself and his entities for tax years 2006–09 "to avoid the taxation of portions of income" he "received and thus to defraud the Internal Revenue Service and the United States."[7] He explains that he knew his returns and supporting items were fraudulent because "they omitted payments" to him "that were taxable as income and created certain false business expense deductions, thereby reducing [his] taxable income and tax due."[8] "These books and records reclassified" his "personal expenses"—like payments to his "female companions for cars, houses, and jewelry"; payments for his gambling debts and home improvements; purchases of luxury cars, real property, and personal gifts; and transfers among his various entities—to business expenses.[9]

The parties stipulated in the plea agreement "that, prior to sentencing," the court would conduct "an evidentiary hearing on the tax loss/restitution figure to be used in sentencing" Desage "and imposing any restitution obligation."[10] They also agreed "to be bound by the Court's tax loss/restitution figure in arguing" Desage's offense-level calculation and sentence.[11]

---

[5] ECF No. 59.

[6] ECF No. 285.

[7] *Id*. at 4, ¶ 1; *see also* Tr. at 20, 53 (wherein defense expert Aloian describes the roles of Akaragian and Parkinson).

[8] *Id*. at 5, ¶ 2.

[9] *Id*. at 5, ¶ 3.

[10] *Id*. at 6.

[11] *Id*.

At that evidentiary hearing, which was held over two days, the government presented the testimony of one of the IRS Revenue Agents (RA) on this case, Evelyn K. Fall, and of the case agent, Special Agent (SA) Julie Bomstad. Fall testified that Desage underreported and underpaid his income tax by $28,221,767 for tax years 2006–09.[12] But Desage aims to neutralize the impact of his plea-agreement admissions by arguing that he could have claimed tens of millions of dollars more in tax deductions that would have wiped out his entire tax deficiency. To support that position, Desage offered the testimony of his CPA Michael Aloian, who opined that Desage owes no tax because Desage, a prolific high roller, had unaccounted-for cash floating around from casino-gaming cash-outs, and he used $28.6 million of that cash to repay loans and fund other business expenses, offsetting the entirety of this tax obligation.[13]

The parties presented post-hearing briefs summarizing their burdens and how the evidence satisfies them.[14] In its brief, the government walks through the testimony of RA Fall and how her careful analysis establishes by a preponderance of the evidence that Desage evaded paying $28,221,767 in income tax for the years 2006–09. It argues that Desage failed to meet his burden to show that his tax balance is wiped out by unclaimed business-expense deductions because Aloian used a flawed methodology to support his theory and a "self-serving switch in accounting methods" that renders his computation unreliable.[15] Desage responds that Aloian's calculation method is the right one and maintains that currency transaction reports (CTRs)

---

[12] *See* Tr. at 93–94.

[13] *See* Tr. at 46, 302–04. Defense counsel sought to present testimony from themselves and Desage as the scheduled two-day hearing was wrapping up. *See* Tr. at 316–18; ECF No. 309, 310 (defense brief and errata re: additional witnesses); ECF No. 311 (government response); ECF No. 312 (defense reply). But I denied that request and set a briefing schedule for post-hearing briefs. *See* ECF No. 316.

[14] ECF Nos. 326, 336, 338.

[15] ECF No. 326.

reflecting casino cash-outs to Desage and anecdotal evidence from Desage's lenders show that "the total cash paid for deductible expenses related to loans (e.g., interest and funding fees) was approximately $28.6 million . . . ."[16] The government replies that CTRs are not an accurate tool for determining Desage's cash on hand and, regardless, Desage has not shown—and cannot show—that he used those millions to pay legitimate business expenses, particularly when he admits in his plea agreement that he falsely characterized years of personal expenses as deductible business expenses. And it stresses that Aloian's calculations are based on pure speculation.[17] Assisted by these briefs, I carefully evaluate the evidence presented by both sides.

## Discussion

The parties agree on the legal standards for determining Desage's tax-loss amount. "The government bears the burden of establishing the base offense level, and, hence, here, the amount of tax loss, by a preponderance of the evidence."[18] A precise calculation is not required, and the Sentencing Guidelines advise the court to "simply make a reasonable estimate based on the available facts" when the amount of the tax loss is uncertain.[19]

Courts may also consider a defendant's unclaimed tax deductions in estimating the tax loss for sentencing purposes if, among other factors, the deduction "is reasonably and practicably ascertainable."[20] "The burden is on the defendant to establish any such . . . deduction . . . by a

---

[16] ECF No. 336 at 9.

[17] ECF No. 338.

[18] *United States v. Montano*, 250 F.3d 709, 713 (9th Cir. 2001) (citing *United States v. Howard*, 894 F.2d 1085, 1090 (9th Cir. 1990)).

[19] U.S.S.G. § 2T1.1 application note 1.

[20] *Id*. application note 3.

4

preponderance of the evidence."[21] And a court is not required "to speculate about tax deductions that the taxpayer chose not to claim."[22]

### A. The government proved by a preponderance of the evidence that Desage's tax-loss amount was $28,221,767 for TY 2006–09.

The government proved by a preponderance of the evidence that Desage's admittedly fraudulent tax shenanigans created a tax loss of $28,221,767 for tax years 2006 through 2009. The analysis performed by well-qualified and veteran revenue agent Fall[23] established that she evaluated Desage's tax obligations beginning with a blank slate and used bank records, documentation underlying the claimed expenses and unreported income, and memoranda of interviews to piece together a true picture of Desage's activity[24] despite the state of his own books and records, which his own expert characterized as "inadequate."[25] Working through each of the tax years at issue, Fall identified scores of fraudulent deductions, like personal purchases of homes, cars, furs, and jewelry for girlfriends and acquaintances falsely claimed as business expenses; arbitrarily inflated expenses; and non-deductible book-to-book transfers.[26] She pointed out tens of millions in unreported or hidden income.[27] But she also gave Desage the benefit of any true deduction, including loan interest, funding fees, or commissions.[28] Fall concluded after this detailed and extensive analysis that Desage underreported and underpaid his

---

[21] *Id.*
[22] *United States v. Yip*, 592 F.3d 1035, 1041 (9th Cir. 2010).
[23] Tr. at 88–89.
[24] Tr. at 90–94.
[25] Tr. at 16:12–14.
[26] Tr. at 94–99, 107–08.
[27] Tr. at 96, 98, 106–07, 117–18.
[28] Tr. at 101–110, 126–27.

5

income tax obligation by $28,221,767 for tax years 2006–09. I found her analysis well supported and her testimony and methodology credible.

Desage argues that RA Fall's methodology is "fraught with problems" and inaccurate because "she relied on" Desage's tax preparer's "calculations from the single-entry system and deal sheets that were unreliable," "ignor[ing] the income statement, balance sheet, and QuickBooks provided by Mr. Aloian" who recreated Desage's books using a double-entry system and the accrual method of accounting.[29] But this characterization is belied by Fall's testimonial description of the process she employed:

> Q. Okay. So do you start with a blank slate to do your tax computation and figure out what the income picture is?
>
> A. I start—I started with the bank records. I input the bank deposits, the cash withdrawals for all the business bank accounts. And then I used the classifications that Peter Akaragian had on the Excel spreadsheet so I could get that to the amounts that were on the tax return. We don't start from zero and—we—'cuz we have the tax return. The tax return was filed. There were books. My job is to find the differences between what's on the tax return and what happened.
>
> Q. And why do you do that? Why do you have to know what's on the tax return?
>
> A. Well, the identified unreported income and those expenses, you want to make sure that that unreported income was not reported and you want to make sure those false expenses were taken on the tax returns.
>
> . . .
>
> Q. So what's the next step in your analysis?
>
> A. After I got the books to go to the tax return, then I have to take a look at the underlying documentation for the false expenses and the unreported income by going through the interviews that the special agents did; by looking at the underlying documents that they have received from Grand Jury subpoenas; and then I do an analysis to make my determination.

---

[29] ECF No. 336 at 4–5.

|  |  |  |
|---|---|---|
| 1 | Q. | Okay. So you look at all the underlying material. |
| 2 | A. | Correct. |
| 3 | Q. | Do you just—do you just eyeball what the person who prepared the return did and then— |
| 4 |  |  |
| 5 | A. | No.[30] |

Fall also testified that she did review Aloian's materials, but they were incomplete and left her unable to "check[] Mr. Aloian's work."[31] So Fall did not "ignore" Aloian's work; rather, without the back-up work papers, she was unable to validate it.[32]

Plus, the notion that Aloian's recreation of the books and records using a double-entry, accrual-based accounting system[33] made his calculations more accurate than Fall's overlooks critical flaws in Aloian's methodology. Aloian admitted that he began his reconstruction beginning with December 31, 2005, and simply assumed the accuracy of Desage's balance sheet from that day, despite the fact that Desage had check registers going back to 1986, the business

---

[30] Tr. at 90–92.

[31] Tr. at 247–48.

[32] *Id.*; Tr. at 275–76.

[33] Desage also criticizes Fall's use of a cash accounting method to evaluate his tax obligations when his tax returns were styled by Akaragian as accrual method. *See, e.g.,* ECF No. 336 at 13–18. I find reasonable and reliable Fall's testimony that her method was the appropriate one because, despite Akaragian's labeling of Desage's system as an accrual-basis one, it was truly a cash-based one, and it is the taxpayer's historic and consistent treatment, not mere labeling, that controls. *See* Tr. at 53–56 (Aloian cross); 99–101 (Fall direct) ("On the tax returns, they checked the box "accrual." But they never used the accrual method. . . . Just because the box is checked does not mean that that's the method that they are on."); 163–64, 170–71 (Fall redirect); *see also* U.S.C. § 446(b) ("Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books."). This conclusion is further supported by the fact that an accrual-basis accounting method requires an understanding of the business's inventory, yet Desage didn't keep inventory records. *See* Tr. at 129, 131, 167, 242, 244–49 (Fall testimony); 303–04 (Aloian testimony). I thus credit Fall's testimony on this point over Aloian's.

7

dated back to 1990, Desage had engaged in million-dollar deals before Aloian's chosen start date, and Desage's recordkeeping was notoriously poor.[34] And although the accrual method of accounting relies on the ability to track inventory balances,[35] Desage kept no records of his,[36] making Aloian's assumptions speculative and his accounting conclusions unreliable.

I thus credit the testimony and conclusions of RA Fall regarding Desage's tax obligation over the testimony and conclusions of Mr. Aloian. And I find that the government has established by a preponderance of the evidence that Desage's outstanding tax due and owing to the IRS for tax years 2006–2009 is $28,221,767.

**B. Desage did not satisfy his burden to claim an offsetting amount of unclaimed tax deductions.**

Desage attempts to abrogate that balance with tens of millions of dollars in undocumented cash payments of tax-deductible business expenses. He claims that he "used large amounts of cash to pay lenders interest and funding fees."[37] Though he admits that his records lack the information necessary to determine the amount of such payments, he contends that currency transaction reports (CTRs and CTR-Cs)—which are generated by banks, casinos, and other organizations each time cash of $10,000 or more changes hands[38]—plus anecdotal evidence from Desage's lenders obtained during the course of the IRS's investigation, prove that

---

[34] Tr. at 16, 20, 294–97.
[35] Tr. at 164, 242, 284, 286, 297, 303–05.
[36] Tr. at 245–47.
[37] ECF No. 336 at 7.
[38] Tr. at 35 (Aloian); at 174 (Bomstad).

8

he made "approximately $28.6 million" in cash payments for deductible expenses related to loans during the subject time period.[39]

But that evidentiary foundation is unsound. The government established that CTRs are not a reliable tool for calculating cash on hand or tracing its path. As RA Fall explained, "just because someone takes money out of a casino and the money goes back into a bank account, you don't know—that money could be the same money. CTRs are just information documents. You don't know if that's the same money just bein' churned. That's why I don't rely on those."[40] She elaborated with a concrete illustration when questioned by government counsel:

> Q: . . . Why don't you use CTRs to reconstruct income?
>
> A. Because they are just info items. The money can—it could be the same money as I explained. It's just—you don't—you can't trace it. It goes in; it comes out. It could be the same funds goin' in and out, in and out.
>
> Q. So I can use a hundred dollars. And, if I use it in the correct way to generate CTRs, I can make it look like I have a million dollars.
>
> A. Correct.
>
> Q. And that could happen unintentionally also just based on a lot of churning[41] of transactions?

---

[39] ECF No. 336 at 7–9; Tr. 70 (Q (to Aloian): "is it fair for me to say that your conclusion as to the unclaimed deductions is that there's an unaccounted for $28.6 million in cash out there? A. Yes."), 301–02 (Aloian).

[40] Tr. at 156–57 (Fall).

[41] *See also* Tr. at 165–66 (where Fall explains, "if you go to the casino and you walk out with cash that's out of your line of credit and then you deposit it back into the business account the next day and then the next -- and then you wire money to pay down your credit and you go back the next night, use the credit, walk out again, deposit the money back into the bank account, that is a method of churning money," and that Desage "was treating the casinos like a bank").

9

> A. You take the money out of the bank; you put the money back in the bank. You take the money out of the casino; you put the money back in the bank. It's—
>
> Q. Are you familiar with any kind of method or practice of estimating cash on hand based on CTRs?
>
> A. No.[42]

SA Bomstad corroborated RA Fall's opinion that CTRs and CTR-Cs are "not a reliable basis for determining cash on hand."[43] And even Mr. Aloian agreed that one cannot "determine whether or not a unique piece of money is represented by a particular CTR."[44]

Aloian also explained that he arrived at his $28 million-in-undocumented-tax-deductible-expenses-paid-with-cash theory "based on what Mr. Desage has told [him]" and just used the CTRs, CTR-Cs, and other evidence gathered by the IRS "as corroboration."[45] But even those CTRs fail to show that Desage had a cache of cash. Consistent with the old adage that Las Vegas wasn't built on winners, the government's analysis of Desage's CTR activity shows that he was actually a net loser at the casinos[46] and that he had a deficit of cash on hand, not a surplus—all of which belies Aloian's theory.[47]

That theory is further undermined by the anecdotal evidence of Desage's loan-repayment practices. When interviewed by the IRS, none of Desage's investors or lenders during the

---

[42] Tr. 162–63 (Fall).

[43] Tr. 176–78, 203 (Bomstad).

[44] Tr. 301 (Aloian).

[45] Tr. 301–02 ("Those things all corroborate the—the availability of the cash to pay what Mr. DeSage told me he paid.").

[46] Tr. at 301 (Aloian) ("Q. And have you looked at it—the gaming records show he's a net loser; correct? A. Yes. Q. And significantly so. A. Yes.").

[47] Tr. at 174–78 (Bomstad).

10

2006–09 time frame described being paid tens of millions of dollars in cash, and the government's computations gave Desage credit for the cash payments on his debts that Desage or third parties had record of.[48] Desage highlights as "[t]he strongest corroboration" of these "large cash payments" the fact that one lender, William Richardson, "confirmed and documented that in a 10 month period he received in excess of $6.6 million cash from" Desage "for lending" Desage money.[49] Aloian's undocumented-cash theory relies on an "extrapolation . . . [from] Desage's kind of way of doing business with William Richardson."[50] But the corroborative strength of the Richardson evidence is overstated because it relates to different tax years than the ones at issue here.[51]

Aloian also conceded that his extrapolation approach is not based on GAAP or any IRS instruction.[52] So, in an effort to legitimize it, Aloian notes that some courts have recognized that an approximation of a taxpayer's tax-deductible expenses can be appropriate when there is "some basis for computation"—like Judge Learned Hand did when holding in 1930 that Broadway showman and Yankee Doodle Dandy George M. Cohan was likely entitled to some entertainment- and travel-expense deductions despite keeping no spending records.[53] But the Ninth Circuit recognized in *Norgaard v. Commissioner*[54] that the *Cohan* rule has limited

---

[48] Tr. at 152–55, 161–62, 227–30; Exh. 8 (memo of interview with H. Vechery); Exh. 9 (memo of interview of H. Frey); Exh. 10 (memo of interview of Y. Hefetz); Exh. 11 (memo of interview of P. Akaragian) ("DESAGE has a gambling problem. . . . His gambling winnings and also unspent cash from casino markers get deposited into his business bank account.").

[49] ECF No. 336 at 9.

[50] Tr. at 71–72 (Aloian).

[51] *Id.*

[52] Tr. at 72–73 (Aloian).

[53] *Cohan v. Comm. of Internal Revenue*, 39 F.2d 540, 544 (2d Cir. 1930); Tr. at 72–73 (Aloian).

[54] *Norgaard v. Comm. of Internal Revenue*, 939 F.2d 874 (9th Cir. 1991).

11

application. It gives the tax court "considerable latitude in estimating the amount of the allowable deduction" but "does not 'require that such latitude be employed'" by the district court reviewing a tax-court decision.[55] Desage has provided nothing to suggest that the *Cohan* rule has been extended to criminal tax-loss calculations to displace the recognized standards that "[t]he burden is on the defendant to establish any such . . . deduction . . . by a preponderance of the evidence"[56] and that a district court is not required "to speculate about tax deductions that the taxpayer chose not to claim."[57]

Even if I were persuaded to extend the *Cohan* rule to the criminal context, I could not justify it here. The *Cohan* court remanded to "reconsider the evidence" because it was obvious to the court that Cohan would have incurred such deductible expenses but the Board made a blanket denial "on the ground that it was impossible to tell how much he had spent, in the absence of any items or details."[58] It is not similarly obvious here that Desage made tens of millions of dollars in cash payments that he could have written off. The government has foreclosed that assumption with its CTR analysis that shows that Desage had a deficit, not surplus of cash; that the cash loan repayments have been accounted for in the government's calculations; and that Desage's fondness for lavish-lifestyle expenditures—often funded by loans[59]—like fur coats, luxury automobiles, and private jet travel,[60] makes it more likely that Desage's cash, if any, was blown on things that weren't tax deductible. And, unlike Cohan,

---

[55] *Id.* at 879 (quoting *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957)).
[56] U.S.S.G. § 2T1.1 application note 3.
[57] *Yip*, 592 F.3d at 1041.
[58] *Cohan*, 39 F.2d at 543.
[59] *See* Tr. at 254–55 ("Desage live[d] off loans").
[60] *See* Tr. at 182–89.

12

Desage pled guilty to conspiring to defraud the IRS and admitted under penalty of perjury that he agreed with his bookkeeper and tax preparer to create false business-expense deductions "to avoid the taxation of portions of income" he "received and thus to defraud the Internal Revenue Service and the United States,"[61] undercutting the credibility of Desage's representations that form the factual foundation of Aloian's theory.

## Conclusion

I thus find that the government has met its burden to show that Desage's outstanding tax due and owing to the IRS for tax years 2006–09 is $28,221,767. I further conclude that Desage has not met his burden to show that he made tens of millions in previously unclaimed, undocumented, tax-deductible, all-cash loan payments during the tax years in question. So I apply the figure in USSG § 2T4.1(L) (tax loss > $25,000,000) for sentencing purposes and find that the amount of actual loss attributed to Desage's conduct here—and thus his restitution obligation—is $28,221,767. Sentencing will take place on September 23, 2019, at 2 p.m.

Dated: July 19, 2019

_____
U.S. District Judge Jennifer A. Dorsey

---

[61] ECF No. 285.